UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-61596-RUIZ/STRAUSS

**PINEWOOD CONDOMINIUM APARTMENTS, INC.,**

    Plaintiff,
v.

**SCOTTSDALE INSURANCE CO.,**

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court upon Plaintiff's Motion for Partial Summary Judgment as to Defendant's First, Fifth, and Seventh Affirmative Defenses and Counterclaim ("Plaintiff's Motion") [DE 44] and Defendant Scottsdale Insurance Company's Motion for Summary Judgment as to Its First, Fifth, and Seventh Affirmative Defenses and Counterclaim ("Defendant's Motion") [DE 50]. The motions were referred to me to take all necessary and proper action as required by law [DE 55]. I have reviewed the motions, the responses and replies to the motions [DE 48, 51, 52, 53], all other summary judgment materials, and all other pertinent portions of the record. I also held a hearing (the "Hearing") on the motions on July 11, 2022. *See* [DE 59]. For the reasons discussed herein, I respectfully **RECOMMEND** that Defendant's Motion [DE 50] be **GRANTED** and that Plaintiff's Motion [DE 44] be **DENIED**.

## BACKGROUND

Defendant/Counter-Plaintiff, Scottsdale Insurance Co. ("Scottsdale"), issued a policy of insurance ("Policy") [DE 44-1] to Plaintiff/Counter-Defendant, Pinewood Condominium Apartments, Inc. ("Pinewood"). *See* Defendant Scottsdale Insurance Company's Statement of

Material Facts ("Scottsdale SMF") [DE 49] ¶ 1 (undisputed). As reflected in the Policy, the Policy Period covers April 17, 2020 to April 17, 2021. SIC 000004.[1] On December 16, 2020 (during the Policy Period), Pinewood suffered a "Drainline Backup loss" that was caused by a "Broken/Fractured Drainline"; it subsequently submitted a claim for this loss. *See* Sworn Statement in Proof of Loss [DE 47-6]. As made clear at the Hearing, the events that occurred at the insured property on December 16, 2020 (i.e., the cause of the claim submitted by Pinewood) are undisputed. Specifically, both parties acknowledged – at the Hearing – that it is undisputed that broken or cracked drain lines underneath the property led to water backup from sinks and toilets, which caused some damage to property such as cabinets. But the parties dispute whether Pinewood is entitled (under the Policy) to recover costs for tearing out and replacing part of the structure that Pinewood will need to tear out to reach and fix the broken/cracked drain lines.[2]

Following the submission of Pinewood's claim, Scottsdale issued a payment to Pinewood for $116,405.24. *Compare* Scottsdale SMF ¶ 13 *with* Plaintiff's Response to Defendant's Statement of Material Facts [DE 52] at 2, ¶ 13; *see also* [DE 47-4]. Of that amount, Pinewood received $104,764.72, following a payment to its independent adjuster. Scottsdale SMF ¶ 14 (undisputed); *see also* [DE 49-8]. Subsequently, Scottsdale demanded that Pinewood return the funds it received from Scottsdale, contending that Pinewood's claim was limited to $5,000 under the Policy and that Pinewood was therefore required to repay the funds it received over and above that $5,000 amount. *See* [DE 49-10]. Notwithstanding Scottsdale's demand, Pinewood retained the funds. Scottsdale SMF ¶ 17 (undisputed). Additionally, as Pinewood disagreed with

---

[1] References to the Policy [DE 44-1] will refer to the bate-stamped number in the bottom right-hand corner of each page.

[2] At the time Pinewood submitted its claim, it estimated a cost of repair/replacement in the amount of $467,199.72. [DE 47-6]. At the Hearing, Pinewood estimated that the tear out/replacement costs will exceed $300,000.

Scottsdale's position – and also sought a greater amount than it received from Scottsdale, *see supra* note 2 – it filed a breach of contract claim against Scottsdale in state court. *See* Complaint [DE 1-2]. After removing this matter from state court [DE 1], Scottsdale filed a Counterclaim [DE 3] against Pinewood, asserting an unjust enrichment claim on account of its alleged overpayment to Pinewood.

## **SUMMARY JUDGMENT STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322-23). *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)). Provided

3

that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242). Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted). Moreover, all reasonable doubts regarding the facts must be resolved in favor of the non-moving party. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

## **ANALYSIS**

Both parties seek summary judgment on Scottsdale's First, Fifth, and Seventh Affirmative Defenses, as well as Scottsdale's Counterclaim for unjust enrichment. The parties agree that the three affirmative defenses turn on whether the Policy limits Pinewood's recovery for its claim to $5,000 or whether the Policy permits Pinewood to recover tear out and replacement costs over and above that amount. If Pinewood's insurance claim is limited to $5,000 (or less), Scottsdale will prevail on its affirmative defenses and, thus, the Complaint. If not so limited, Pinewood will defeat the three affirmative defenses (and effectively establish Scottsdale's liability on the Complaint, leaving the issue of damages open). Additionally, if not limited to $5,000, Pinewood will defeat

Scottsdale's Counterclaim for unjust enrichment. However, if limited to $5,000, and provided that the existence of the Policy (an express contract) does not bar Scottsdale's unjust enrichment claim (Pinewood argues it bars the claim), Scottsdale will be entitled to a judgment against Pinewood for $99,764.72 (the $104,764.72 Pinewood received less the $5,000 amount Pinewood is entitled to under the Policy). *See infra* note 7.

Because the material facts here are undisputed, the issue of whether the Policy limits Pinewood's claim to $5,000 turns on the interpretation of the Policy. The standard governing the interpretation of insurance policies under Florida law is discussed in Section A below. In Section B below, I explain why the Policy does in fact limit Pinewood's insurance claim to $5,000. Finally, in section C below, I explain that Scottsdale is entitled to judgment on its unjust enrichment claim because the elements of unjust enrichment are met and because Pinewood's express contract argument does not bar Scottsdale's unjust enrichment claim.

### A. INTERPRETATION OF INSURANCE POLICIES

"Under Florida law, an insurance policy should be read 'as a whole, endeavoring to give every provision its full meaning and operative effect.'" *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1356 (11th Cir. 2022) (quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007)). Courts must interpret the terms of insurance policies "in accordance with the plain language of the policies as bargained for by the parties." *Travelers Indem. Co. of Conn. v. Richard Mckenzie & Sons, Inc.*, 10 F.4th 1255, 1264 (11th Cir. 2021) (quoting *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993)). "When 'a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision.'" *Id.* (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)). However, if a provision is

ambiguous, "it is construed against the insurer and in favor of coverage." *SA Palm Beach*, 32 F.4th at 1356 (citing *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007)).

"While ambiguities are construed in favor of coverage, 'a true ambiguity exists only when the language at issue is reasonably susceptible to more than one interpretation.'" *Richard Mckenzie & Sons*, 10 F.4th at 1264 (quoting *City of Pompano Beach v. Beatty*, 222 So. 3d 598, 600 n.1 (Fla. 4th DCA 2017)). In other words, ambiguity only exists when the terms of a policy make the policy "susceptible to different reasonable interpretations, one resulting in coverage and one resulting in exclusion." *SA Palm Beach*, 32 F.4th at 1356 (quoting *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174-75 (11th Cir. 1985)). Simply because a provision is complex, a term is undefined, or the parties disagree over the meaning of language in a policy does not mean that ambiguity exists. *Id.*; *Richard Mckenzie & Sons*, 10 F.4th at 1264.

### B. COVERAGE[3]

The Policy unambiguously limits Pinewood's insurance claim to $5,000. This issue turns on certain key provisions of the Policy. As indicated above, Pinewood's entitlement to tear out and replacement costs (over and above $5,000) is what is disputed here. The Policy contains a provision regarding the ability to recover these costs, which provides as follows:

> **F. Additional Coverage Extensions**
> . . .
> **2. Water Damage, Other Liquids, Powder Or Molten Material Damage**
> If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the

---

[3] I note that my analysis is largely consistent with a "roadmap" that the District Court provided to the parties at a March 29, 2022 hearing on a motion for judgment on the pleadings. *See generally* [DE 60]. However, my conclusion differs with some parting thoughts that the District Court offered at that hearing. Nonetheless, as the transcript of that hearing reveals, not all of the facts of the case were reflected in the record at the time of that hearing, which concerned a motion that was confined to the pleadings. Now, however, all of the material facts are both known and undisputed.

>   system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

SIC 000056 ("F2 Tear Out Provision").

Given the undisputed cause of loss in this case, the ability to recover under the F2 Tear Out Provision turns on whether there was "Water Damage" as defined under the Policy (i.e., whether there was "loss or damage caused by or resulting from covered water . . . damage[.]"). Central to this inquiry, the Policy provides the following definition for "Water Damage":

>   **G. Definitions**
>   . . .
>   **2.** "Specified causes of loss" means the following: . . . water damage.
>   . . .
>   >   **c.** Water damage means:
>   >   **(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and
>   >   **(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe caused by wear and tear, when the pipe is located off the described premises and is connected to or is part of a potable water supply system or sanitary sewer system operated by a public or private utility service provider pursuant to authority granted by the state or governmental subdivision where the described premises are located.
>   >   ***But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion.*** Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which

> follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.
>
> To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

SIC 000057 ("Water Damage Definition") (emphasis added).

As both parties acknowledged at the Hearing, it is undisputed that the G.2.c.(1) portion of the Water Damage Definition describes what occurred here. However, both parties also acknowledged that what occurred here also falls within the ambit of the Water Exclusion. Specifically, the relevant portion of the Water Exclusion provides as follows:

> **B. Exclusions**
>
> **1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
> . . .
>> **g.  Water**
>>
>> . . .
>>
>>> **(3)**  Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment[.]

SIC 000048-49 ("B.1.g.(3) Water Exclusion"). As confirmed at the Hearing, it is undisputed that the loss or damage at the insured property that is the subject of this case was caused by water that backed up or overflowed or that was otherwise discharged from a sewer or drain.[4] Thus, the B.1.g.(3) Water Exclusion describes what occurred in this case, and as the Water Damage Definition provides, even if G.2.c.(1) or G.2.c.(2) is satisfied, "water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion." SIC 000057.

---

[4] The Policy defines "Sewer" as "any underground pipe, channel or conduit for carrying water, wastewater or sewage on or away from the premises described in the Declarations." SIC 000063. It defines "Drain" as "any pipe, channel or conduit for carrying water, wastewater or sewage on or away from the premises described in the Declarations to a 'sewer.'" *Id.*

However, the Policy also contains an extension covering up to $5,000 in loss or damage caused by or resulting from water backup or overflow of sewers and drains. Specifically, this extension provides as follows:

> **7. Water Backup Or Overflow Of Sewers And Drains**
> 
> a. We will pay for direct physical loss or damage to Covered Property caused by or resulting from water that backs up or overflows or is otherwise discharged from a sewer, drain, sump or sump pump.
> 
> The most we will pay for this Extension is $5,000 at each described premises.
> 
> b. Under the **CAUSES OF LOSS - SPECIAL FORM,** subsection **B. Exclusions,** paragraph **g.(3)** (Water that backs up or overflows from a sewer, drain or sump) is deleted for the purposes of this Extension only.

SIC 000021-22 ("Water Extension").

It is clear that, without the Water Extension, the F2 Tear Out Provision would not be triggered. That is because "water damage" (as defined under the Water Damage Definition) is needed to trigger the F2 Tear Out Provision, and no "water damage" would exist because of the B.1.g.(3) Water Exclusion. In other words, even though the G.2.c.(1) portion of the Water Damage Definition is satisfied, the Water Exclusion then takes what occurred at the insured property back outside the scope of the Water Damage Definition. *See* SIC 000057 ("But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion."). As made clear at the Hearing, the foregoing is not in dispute (again, putting aside the Water Extension). This conclusion is also consistent with three recent cases in this district (all involving Scottsdale) that contained identical or nearly identical F2 Tear Out Provisions, Water Damage Definitions, and B.1.g.(3) Water Exclusions. *See 1901 Holding, LLC v. Scottsdale Ins. Co.*, No. 20-60865-CIV, 2021 U.S. Dist. LEXIS 116642 (S.D. Fla. June 22, 2021); *Purdy Lane, Inc. v. Scottsdale Ins.*

9

*Co.*, No. 20-80966-CIV, 2021 WL 1053283 (S.D. Fla. Feb. 11, 2021); *Raffell v. Scottsdale Ins. Co.*, No. 20-21719-CIV, 2021 U.S. Dist. LEXIS 4843 (S.D. Fla. Jan. 8, 2021).[5]

Where those cases differ, though, is they dealt with policies that did not contain the Water Extension that is present in the Policy in this case. In the Policy in this case, after the Water Exclusion takes away coverage for loss or damage caused directly or indirectly by "[w]ater that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment," SIC 000048-49, the Water Extension gives back coverage "for direct physical loss or damage to Covered Property caused by or resulting from water that backs up or overflows or is otherwise discharged from a sewer, drain, sump or sump pump." SIC 000021. But it only does so up to a limit of $5,000. *See id.* ("The most we will pay for this Extension is $5,000 at each described premises.").

Thus, as a result of the Water Extension, Pinewood now has coverage (up to $5,000) for loss or damage caused by or resulting from water backup etc. – coverage it would not have had but-for the Water Extension. Consequently, the issue becomes whether the fact that Pinewood now has covered water damage for purposes of the Water Extension *only* is enough to trigger coverage under the F2 Tear Out Provision. It is not.

At the Hearing, Pinewood's counsel argued otherwise, noting that the Water Extension deleted the B.1.g.(3) Water Exclusion. By this reasoning, without the B.1.g.(3) Water Exclusion, loss or damage caused by water backup is once again covered "water damage" for purposes of the

---

[5] The G.2.c.(2) portion of the Water Damage Definition in *Purdy Lane* is worded somewhat differently than G.2.c.(2) is in the Policy in this case, but the G.2.c.(2) portion of the Water Damage Definition is not at issue in this case. Regardless, the F2 Tear Out Provision, Water Damage Definition, and B.1.g.(3) Water Exclusion in this case are otherwise identical to the corresponding provisions in *Purdy Lane*, and they are completely identical to the corresponding provisions in *1901 Holding* and *Raffell*.

F2 Tear Out Provision. Pinewood's argument is only partially correct, however, as the Water Extension deleted the B.1.g.(3) Water Exclusion "for the purposes of this Extension only." SIC 000022. Stated differently, the Water Extension did not delete the B.1.g.(3) Water Exclusion for purposes of any provision in the Policy other than the Water Extension. That would include the F2 Tear Out Provision, which is a separate coverage extension. Finding coverage to exist under the F2 Tear Out Provision as a result of the Water Extension would ignore and render meaningless the words "for the purposes of this Extension only." Because the Court must "give every provision its full meaning and operative effect," *SA Palm Beach*, 32 F.4th at 1356, the Court should conclude that there is no coverage under the F2 Tear Out Provision in this case, and consequently, that Pinewood is limited to recovering $5,000 under the Water Extension. Therefore, Scottsdale is entitled to summary judgment on its First, Fifth, and Seventh Affirmative Defenses.[6]

### C. SCOTTSDALE'S COUNTERCLAIM FOR UNJUST ENRICHMENT

Scottsdale is entitled to summary judgment on its unjust enrichment claim. A party pursuing an unjust enrichment claim under Florida law must establish the following elements: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it."

---

[6] A couple final notes regarding certain arguments the parties raise: First, the parties' briefs argue over the meaning of "Limit of Insurance" in the F2 Tear Out Provision. However, because I find that the F2 Tear Out Provision is not triggered (as there is no "water damage" except for purposes of the Water Extension only), it is not necessary to wrestle with the meaning of "Limit of Insurance" in the F2 Tear Out Provision. Second, *Sec. First Ins. Co. v. Vazquez*, 336 So. 3d 350 (Fla. 5th DCA 2022), a case on which Pinewood relies, does not impact the analysis or result here. The language in the policy in *Vazquez* is different from the language in the Policy in this case and, significantly, the *Vazquez* decision did not turn on the type of language that dictates the outcome here – "for the purposes of this Extension only." In fact, *Vazquez* turned on interpreting language regarding "the limit of liability," *see id.* at 352-53, but as noted above, the meaning of "Limit of Insurance" in this case does not impact the outcome.

*F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 48 (Fla. 4th DCA 2021) (citing *Com. P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997)). "If an entity accepts and retains benefits that it is not legally entitled to receive in the first place, Florida law provides for a claim of unjust enrichment." *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013).

As discussed above, Scottsdale's unjust enrichment claim is premised upon an alleged overpayment in the amount of $99,764.72.[7] Given that Scottsdale received $104,764.72 even though it is limited to $5,000 under the Policy (for the reasons discussed in the preceding section), Scottsdale did in fact overpay Pinewood by $99,764.72. Moreover, the material facts supporting the elements of Scottsdale's unjust enrichment claim are undisputed. *See* Scottsdale SMF ¶¶ 14-17 (undisputed) (acknowledging that Pinewood received $104,764.72, that it has knowledge of the funds paid by Scottsdale, that it has not spent the funds, and that it continues to retain the funds in its bank account despite knowing that Scottsdale requested repayment of the funds Scottsdale asserts Scottsdale overpaid).

In its response to Defendant's Motion, Pinewood does not contend that the unjust enrichment elements have not been established. Rather, it raises only one argument (in addition to its argument that it was not limited to $5,000 under the Policy, which fails for the reasons discussed in the preceding section). That is, Pinewood argues that Scottsdale's unjust enrichment claim fails because there is an express contract governing the parties' relationship (i.e., the Policy).

---

[7] The Counterclaim requests judgment in the amount of $111,405.24. However, in Defendant's Motion, Scottsdale reduces this amount to $99,764.72 in order to account for the funds that Pinewood's independent adjuster received. In other words, the undisputed facts show that Pinewood received net funds from Scottsdale in the amount of $104,764.72 [DE 49-8], and the $99,764.72 amount that Scottsdale seeks pursuant to its motion is the net amount Pinewood received less the $5,000 that Scottsdale concedes it owes under the Water Extension.

12

In this regard, "Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *Alhassid v. Nationstar Mortg. LLC*, 771 F. App'x 965, 969 (11th Cir. 2019) (quoting *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008)). However, Pinewood overlooks the "same subject matter" requirement, which is a crucial aspect of the general principle that one cannot pursue a claim for unjust enrichment if an express contract exists. *See F.H. Paschen*, 311 So. 3d at 49 ("This general principle has often been misapplied to *all* disputes arising out of an express contract. Reliance upon a theory of implied contract is barred only if an express contract concerns the same subject matter as the implied contract." (citations omitted)); *AutoNation, Inc. v. GAINSystems, Inc.*, No. 08-61632-CIV, 2009 WL 1941279, at *4 (S.D. Fla. July 7, 2009) ("This general rule, however, does not apply when the quasi-contractual claims concern matters which are outside the scope of the contract." (citation omitted)).

Here, the subject matter of Scottsdale's unjust enrichment claim – an alleged overpayment by Scottsdale – is not a subject matter covered by the Policy. In fact, the Policy does not address what rights, if any, Scottsdale may have in the event of an overpayment to Pinewood. The Policy does not allow or prohibit Scottsdale from recovering an overpayment. It is simply silent on the issue. That is precisely why Scottsdale has not asserted a breach of contract claim in this action. It could not have pursued such an action to recover its overpayment given that the Policy does not address the subject matter of an overpayment by Scottsdale. Thus, as Scottsdale argues, an equitable claim such as unjust enrichment presents Scottsdale's only avenue to recovering its

overpayment to Pinewood.[8]  Therefore, judgment should be entered in favor of Scottsdale on its unjust enrichment claim in the amount by which Pinewood was unjustly enriched ($99,764.72).

## CONCLUSION

For the reasons discussed above, I respectfully **RECOMMEND** that the District Court **GRANT** Defendant's Motion [DE 50], **DENY** Plaintiff's Motion [DE 44], and enter Final Judgment in favor of Scottsdale in the amount of $99,764.72.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 15th day of July 2022.

*[signature]*
Jared M. Strauss
United States Magistrate Judge

---

[8] *Cf. Sec. & Exch. Comm'n v. Price*, No. 1:12-CV-2296-TCB, 2015 WL 11198937, at *6 (N.D. Ga. Mar. 31, 2015) ("Where a contract governs the disputed issue, the receiver is correct that Georgia law disallows a money had and received claim. But before the Court are insurance contracts that have no plain or unmistakable language governing restitution, overpayment, or payments made under a mistake of fact. Absent such a provision, the insurers could not have asserted a breach of contract claim following the receiver's refusal to return the funds at issue. There being no provision in either policy that addresses the subject of the current dispute, maintenance of a claim for money had and received is appropriate." (footnote and citation omitted)); *see also id.* at *6 n.5 (noting that a "money had and received" claim is the functional equivalent of an unjust enrichment claim).